UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT ARTHUR CLARK,<br>Petitioner,<br>v.<br>PATRICK COVELLO, Warden,<br>Respondent. | No. 2:23-cv-01088-DC-CSK<br><br>FINDINGS AND RECOMMENDATIONS |

Petitioner is a state prisoner, proceeding without counsel, with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his conviction for second degree murder by use of a firearm. This matter is fully briefed. After careful review of the record, this Court concludes that the petition should be denied.

I. PROCEDURAL BACKGROUND

**A. State Court History**

On May 15, 2019, in the San Joaquin County Superior Court, petitioner was convicted of second degree murder (Cal. Penal Code § 187(A)) with associated firearms enhancements. (ECF No. 13-1 at 1.) Petitioner was sentenced on December 23, 2019 to a state prison term of 40 years to life. (ECF Nos. 13-1 at 1 & 29-1 at 1.)

Petitioner appealed his conviction. (ECF No. 27-7.) He raised the following arguments in

his brief on appeal: (1) the trial court erred in inquiring into the identity of the lone holdout juror and subsequently discharging Juror No. 1 in violation of the Sixth Amendment right to a jury trial; (2) the trial court erred in denying petitioner's motion for new trial based on juror misconduct where jurors relied on facts not in evidence in violation of the Sixth Amendment right to a jury trial; and (3) petitioner was denied his Fourteenth Amendment right to due process and a fair trial because the trial court was biased against trial counsel and toward the prosecutor, with whom the trial court had worked in an outside capacity. (ECF No. 27-7.)

On December 23, 2021, the California Court of Appeal affirmed the judgment in a reasoned opinion. (ECF No. 13-2.) Petitioner filed a petition for review in the California Supreme Court, raising the same claims as in his opening brief. (ECF No. 13-3.) The Court denied the petition on March 16, 2022. (ECF No. 13-4.)

**B. The Federal Petition**

The federal petition was filed on June 7, 2023. (ECF No. 1.) On September 18, 2023, respondent filed a motion to dismiss ground one (ineffective assistance of counsel) as unexhausted. (ECF No. 14.) Plaintiff requested leave to file an amended petition (ECF No. 16), which was granted by the previously-assigned magistrate judge. (ECF No. 17.) The first amended petition (ECF No. 22) was filed on January 2, 2024. (ECF No. 22.) On March 1, 2024, respondent filed an answer. (ECF No. 28.) On May 6, 2024, petitioner filed a traverse. (ECF No. 33.)

Petitioner raises two claims in the amended petition: (1) the jury engaged in prejudicial misconduct which deprived petitioner of his Sixth and Fourteenth Amendment rights; and (2) the trial court was biased against petitioner and toward the prosecutor, violating petitioner's right to due process and a fair trial.

II. FACTS

After independently reviewing the record, this Court finds the state appellate court's factual summary to be accurate and adopts it herein:

> The facts underlying defendant's case are irrelevant to the contentions he raises on appeal. Suffice it to say that defendant, his girlfriend, and his friend used methamphetamine nearly every day. They heard a female acquaintance had been raped and that the female acquaintance was also coming into a large inheritance. Under a

> misguided attempt to share in her inheritance, defendant, along with his girlfriend and friend, confronted the alleged rapist and defendant shot and killed him. While the victim of the shooting declared, as he was dying, that it was defendant who shot him, and defendant's girlfriend and friend corroborated that declaration through their testimony at trial, other witnesses saw only defendant's friend's truck at the scene of the shooting and not the vehicle defendant occupied or defendant himself.

People v. Clark, No. STKCRFECOD20170007609 (ECF No. 13-2).

## III. STANDARDS FOR A WRIT OF HABEAS CORPUS UNDER ANTITERRORISM AND EFFECTIVE DEATH PENALTH ACT ("AEDPA")

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a). A federal writ is not available for alleged error in the interpretation or application of state law. See Wilson v. Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

For purposes of applying § 2254(d)(1), "clearly established Federal law" consists of holdings of the Supreme Court at the time of the last reasoned state court decision. Thompson v. Runnels, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing Greene v. Fisher, 565 U.S. 34, 39-40 (2011)); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 412 (2000)). Circuit court precedent "may be persuasive in determining what law is clearly

established and whether a state court applied that law unreasonably." Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)). However, circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." Marshall v. Rodgers, 569 U.S. 58, 64 (2013) (citing Parker v. Matthews, 567 U.S. 37, 48-49 (2012) (per curiam)). Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct. Id. Further, where courts of appeals have diverged in their treatment of an issue, there is no "clearly established federal law" governing that issue. See Carey v. Musladin, 549 U.S. 70, 77 (2006).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640 (2003). Under the "unreasonable application" clause of § 2254(d)(1), "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions, but unreasonably applies that principle to the facts of the prisoner's case."[1] Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (quoting Williams, 529 U.S. at 413); see also Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004). In this regard, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams, 529 U.S. at 411; see also Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Lockyer, 538 U.S. at 75 ("It is not enough that a federal habeas court, in its independent review of the legal question, is left with a firm conviction that the state court was erroneous") (internal quotations and citation omitted). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011)

[1] Under § 2254(d)(2), a state court decision based on a factual determination is not to be overturned on factual grounds unless it is "objectively unreasonable in light of the evidence presented in the state court proceeding." Stanley, 633 F.3d at 859 (quoting Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004)).

(quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." Id. at 103.

If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review of a habeas petitioner's claims. Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.").

The court looks to the last reasoned state court decision as the basis for the state court judgment. Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at 99. This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." Id. at 99-100. Similarly, when a state court decision on petitioner's claims rejects some claims but does not expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the merits. Johnson v. Williams, 568 U.S. 289, 298-301 (2013) (citing Richter, 562 U.S. at 98). If a state court fails to adjudicate a component of the petitioner's federal claim, the component is reviewed de novo in federal court. See, e.g., Wiggins v. Smith, 539 U.S. 510, 534 (2003).

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine

whether habeas corpus relief is available under § 2254(d). Stanley, 633 F.3d at 860; Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes, 336 F.3d at 853. Where no reasoned decision is available, the habeas petitioner has the burden of "showing there was no reasonable basis for the state court to deny relief." Richter, 562 U.S. at 98.

A summary denial is presumed to be a denial on the merits of the petitioner's claims. Stancle v. Clay, 692 F.3d 948, 957 & n.3 (9th Cir. 2012). While the federal court cannot analyze just what the state court did when it issued a summary denial, the federal court reviews the state court record to "determine what arguments or theories . . . could have supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Richter, 562 U.S. at 101. It remains the petitioner's burden to demonstrate that 'there was no reasonable basis for the state court to deny relief.'" Walker v. Martel, 709 F.3d 925, 939 (9th Cir. 2013) (quoting Richter, 562 U.S. at 98).

When it is clear, however, that a state court has not reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court must review the claim de novo. Stanley, 633 F.3d at 860 (citing Reynoso v. Giurbino, 462 F.3d 1099, 1109 (9th Cir. 2006)).

## IV. DISCUSSION

### A. Claim One: Juror Misconduct

Petitioner claims that two jurors—an engineer and a former methamphetamine user—committed misconduct by introducing "specialized knowledge" to the jury that had no basis in the record, and that these impermissible statements undercut his defense. Respondent argues that petitioner has not shown constitutional error or prejudice as to either juror.

In his motion for new trial, petitioner cited evidence that "a juror told the rest of the jury he was an engineer and through some mathematical equation(s) . . . stated because the shooter was tall[,] Clark had to be the shooter." (ECF No. 27-2 at 257.) As set forth below by the court of

appeal, Juror No. 1[2] declared that the engineer "discussed the height and angle of the shot; he was doing a lot of math up on the wall. I felt the jury was lost with the engineer's math." Petitioner argues that, because he is approximately 6'4" tall, the engineer's mathematical remarks suggested to the jury that petitioner was the shooter. (ECF No. 27-7 at 40.)

Also in his motion for new trial, petitioner argued that another juror committed misconduct by opining that people under the influence of methamphetamine have an enhanced ability to remember events. (ECF No. 27-2 at 258-260.) According to Juror No. 1 in her declaration in support of the motion for new trial, a juror "disclosed he was a Methamphetamine user and people's recollection of events is enhanced while on Methamphetamine." (ECF No. 27-2 at 258.) Petitioner argues that this juror's "specialized knowledge" of methamphetamine affected how the jury evaluated key evidence. (ECF No. 27-2 at 259.) The defense sought to discredit two prosecution witnesses, Michael Glass and Andrea Carter, "based on the assertion that methamphetamine use clouded their memory of events of the incident[.]" (ECF No. 27-7 at 37.) Petitioner argues that the improper statements suggested to the jury that these witnesses' memory of events was actually "enhanced," and thus the juror's statements prejudiced petitioner. (ECF No. 27-7 at 37-38.)

The trial court denied petitioner's motion for new trial, and petitioner renewed this argument on appeal. As set forth below, the court of appeal denied the claims, reasoning that, while the engineer juror committed misconduct, petitioner had not shown prejudice. As to the methamphetamine-using juror, the court of appeal concluded that he permissibly relayed personal experiences to his fellow jurors.

1. <u>State Court Opinion</u>

The California Court of Appeal issued the last reasoned state court decision addressing this claim. The California Court of Appeal set forth the facts underlying this claim[3] as follows:

---

[2] As set forth in the factual summary below, Juror No. 1 was dismissed from the jury before deliberations and subsequently married petitioner.

[3] Many of the facts set forth below relate to jurors whose actions are not issues on habeas review. The Court has emphasized those facts relating to the engineer juror and the methamphetamine-using juror, whose statements are the subjects of the instant claims.

*Facts Pertaining to Alleged Juror Misconduct*

After the presentation of evidence, the jury deliberated for nine days. During that time, the jury sent multiple notes to the trial court. At the beginning of the second day, it asked to view police body camera footage admitted at trial, as well as defendant's and his girlfriend's interrogations. The jury also requested clarification about which phone numbers were associated with defendant's girlfriend as opposed to defendant's friend.

Before deliberations on the fourth day, the court and parties spoke with Juror No. 1 about a concern she had voiced to the clerk. Juror No. 1 said the experience of serving as a juror was not what she had expected. "We are not supposed to be pressured by others, right, they are not supposed to be changing our minds, trying to change our minds? [¶] Because -- we can discuss the case, but they are really pressuring some individuals in there to try to change their minds. It's uncomfortable and I'm -- I don't know how long it's going to go on like that, but I just don't feel we should be pressured by others into changing our minds." The court reminded the juror that the instructions encourage jurors not to hesitate to change their minds, but not to do so simply because of how other jurors feel. The court assured Juror No. 1 that deliberations can, at times, be uncomfortable but the jurors should never feel unsafe. Juror No. 1 indicated she was being asked the same question over and over by the same juror, who at one point apologized to her for his behavior. She felt like she could not take it anymore because it felt like that juror was trying to change Juror No. 1's mind. Juror No. 1 assured the court that she did not feel unsafe, only uncomfortable, and that the repetitive nature of the deliberations was wearing on her. Juror No. 1 agreed to continue deliberating and send a note through the bailiff in the event she felt uncomfortable.

When excusing the jury to the jury room after speaking with Juror No. 1, the court reread to it the portions of the jury instructions encouraging jurors to talk with one another, keep an open mind, and treat each other courteously. It did so under the guise that several days had passed since the jurors were together and it thought reinstructing the jurors on this point would be helpful. Less than an hour later, the jury requested a readback of the testimony of a witness who was standing near the victim when the victim was shot. The jury later advised the court that it had reached a verdict on first degree murder but could not agree further. The parties agreed to take the jury's not guilty verdict on first degree murder and send the jury back to further deliberate. The court encouraged the jury to think about helpful topics to explore, whether that be through requesting readings of testimony or arguments of counsel. The jury later sent a note stating that it wanted to hear portions of defendant's friend's and girlfriend's testimony that identified defendant as the shooter, as well as hearing further argument from the parties. The court complied with both of those requests.

The next day, the court addressed a note the jury had sent before leaving the day before. The note provided: "We have continued to discuss the case but unfortunately we have come to an impasse. We

feel the discussion has stalled and we are unable to come to a consensus. We plan on coming in to continue deliberating but we seem stalled." Because the jury said it would continue deliberating and did continue deliberating upon returning to court that morning, the trial court and parties agreed to do nothing about the note.

On the seventh day of jury deliberations, Juror No. 7 spoke to the court and parties about concerns he was having with the process. He expressed that there was a single juror who did not seem to be willing to deliberate. Juror No. 7 elaborated that, "we read the rules multiple times, and it seems like they are using -- they are not looking at the evidence and using, 'I don't feel comfortable voting that way just because I'm the deciding vote now. I know I'm the deciding vote.' [¶] They are continuing to use what-if situations. We respond with, 'Okay. Show us the evidence for those what-if situations.' Then they remain silent. [¶] We ask them direct questions. They are silent. When we ask them to argue their side, they are either silent or that person says that they -- 'I said it all yesterday,' or, 'I feel like I've said it multiple times.' [¶] Well, the whole point is to go over this multiple times, and this is my first time doing this, but I feel like we've really broken this down. <u>We have an engineer in there, who has tried to do a rough analyzation [sic] of the bullet trajectory."</u> The trial court cut Juror No. 7 off at this point and focused the conversation on the process of the juror's deliberations instead of the contents of those deliberations. Juror No. 7 stated the juror had minimally participated in the early days of deliberations, in fact, "[t]here's [sic] a few people who are relatively quiet. When asked direct questions of those people, those people responded with evidence and their thoughts and feelings, and it feels like -- I got upset with the person one day so maybe they are even more withdrawn and then -- that's my fault. I'm not a perfect person because I -- we have rules to follow and it looks like they are not following the rules. It's going beyond evidence of why they are voting the way they are voting." Juror No. 7 identified Juror No. 1 as the juror he had been referencing in his complaints.

After Juror No. 7 went back to continue deliberating, the trial court and the parties discussed his concerns. Defendant believed Juror No. 7's concerns were part of the deliberative process and the jury needed more time to come to a verdict. The prosecution expressed concerns that Juror No. 1 was not participating in the process and unwilling to change her mind because she believed herself to be the deciding vote. The trial court decided to take no further action because it seemed the jury was currently deliberating, it had received no note from the foreperson, and Juror No. 1 was minimally participating in the deliberative process.

Later that afternoon, the court brought the parties back to the courtroom because it had discovered Juror No. 1's name on its Monday "restraining order calendar," as a party requesting a restraining order. The court indicated it had reviewed Juror No. 1's restraining order petition and felt it needed to give both parties a copy of the petition, but would do nothing regarding Juror No. 1 until asked.

The next day court convened, the prosecutor requested Juror No. 1 be removed. He argued that Juror No. 1's petition for a restraining order revealed she had a years-long history of being stalked, harassed, and threatened with death, and that she had also been poisoned. She claimed in the petition that she had made several police reports concerning the conduct. When the prosecutor looked up the police reports referenced in Juror No. 1's petition, he saw that she had made other police reports alleging domestic violence. The prosecutor was concerned because Juror No. 1 had said in her questionnaire that she had never been the victim of a crime and had only reported suspicious activity in her neighborhood to the police.

Juror No. 1 was brought into the courtroom and confronted solely by the court. The court questioned Juror No. 1 about the inconsistencies between her petition for a restraining order and her juror questionnaire, as well as the police reports discovered by the prosecutor. Juror No. 1 said she did not realize her experiences were encompassed by the questions asked in the questionnaire. As far as failing to disclose she was a victim of a crime, she had never proven her allegations, she only made reports. As for failing to disclose she had previously made various police reports, Juror No. 1 asserted she had not been thinking about the prior police reports when filling out the questionnaire, thus just forgot to mention them. The court expressed doubt at Juror No. 1's answers given the seriousness of the conduct alleged in her petition.

After Juror No. 1 left the courtroom, Juror No. 10 came into the courtroom to confess that she had spoken about the case to a friend out of frustration toward the long deliberation process and the toll it was taking on her professional and personal life. Juror No. 10 told her friend about the holdout juror and revealed the holdout juror's name to the friend. Somehow Juror No. 10's complaints to her friend made the rounds in the community and Juror No. 1, whom Juror No. 10 identified as the holdout juror, heard about them. Juror No. 10 apologized to the court and accepted full responsibility and the consequences. Juror No. 10 told the court she had known Juror No. 1 professionally years ago but had not seen her in years. She said they currently worked in the same school district but not the same school. They did not socialize. On the Friday before, Juror No. 1 told Juror No. 10 she had heard about Juror No. 10's complaints.

Defendant moved for a mistrial or alternatively to remove Juror No. 1 if the court was inclined to remove Juror No. 10. The prosecutor agreed with the latter suggestion. The court excused both jurors for misconduct, explaining that Juror No. 1 "seemed illusive" and her explanations were insufficient, and that Juror No. 10 violated a rule told to her every day of jury service. Two alternate jurors were empaneled. Three hours later, the jury informed the court that it had reached a verdict. The jury found defendant guilty of second degree murder and found true that he personally used a firearm causing death and during the commission of a felony.

Defendant later filed a motion for a new trial arguing Juror No. 1 should not have been removed from service and that both juror and judicial misconduct had occurred. Defendant attached a declaration

from Juror No. 1, in which Juror No. 1 declared that she remained undecided regarding defendant's guilt throughout deliberations. On the first day of deliberations four jurors were undecided and believed some of the witnesses were not credible because of their drug use. In response, "[a] couple of jurors said they had used methamphetamine and that if you are on methamphetamine's/drugs [sic] your memory is very good. Some of the witnesses said that they couldn't remember certain things because they have been on methamphetamine for so long. [¶] ... The juror said he had used methamphetamine/drugs and remembered things much more clearly when he was using drugs more than a normal person can remember.... [¶] ... The four (4) jurors that [sic] continued to vote undecided said during deliberations that the jurors couldn't trust the memories of the people that [sic] used methamphetamine." As deliberations continued, things got intense with three jurors "picking" on the four undecided jurors, trying to get them to change their votes to guilty. Juror No. 2 said she could not stand the stress anymore and changed her vote to guilty.

Juror No. 1 also declared that "[t]here was one (1) male juror that [sic] said he was an engineer and said that he felt [defendant] was the shooter because of his height. The jury discussed the height of the shooter; that it had to be someone tall. The Engineer discussed the height and angle of the shot; he was doing a lot of math up on the wall. I felt the jury was lost with the engineer's math. The engineer said he knew math; he was always trying to figure things out, with his math problems." The jurors also did math to figure out how far away cars were parked from where the victim was shot.

Defendant also attached a declaration from Juror No. 2. Juror No. 2 declared she "felt the jurors were verbally attacking [Juror No. 1] because they went through the evidence and she continued to vote, Not Guilty." Juror No. 2 also felt "intimidated" by three male jurors, including the foreperson and the engineer. She believed they were intimidating her because they wanted a unanimous verdict of guilty. Juror No. 2 did not believe defendant "received a fair trial because I consider someone else may have committed the crime, but the Judge said we were to consider the evidence only." Juror No. 2 recalled "the Engineer saying something about the height of the shooter. The Engineer acted out the crime, and that it had to be [defendant], because the shooter had to be tall."

Finally, defendant attached a declaration from his attorney. Defendant's attorney declared he had attempted to recuse the judge presiding over defendant's trial because he felt the judge was biased toward the prosecutor and against him. After the proceedings had been suspended to hear the recusal motion, the judge's clerk inquired of defense counsel's availability for trial but then the judge did not pick those dates and instead chose the dates selected by the prosecutor without discussion. The court also denied defense counsel's motion to continue to investigate favorable evidence recently disclosed to the defense. The judge also made numerous adverse rulings related to dismissing Juror No. 1.

Sometime after trial and before the hearing on defendant's motion for a new trial, defendant and Juror No. 1 got married. The

> prosecution introduced jail calls between defendant and Juror No. 1 at the hearing on defendant's motion for a new trial, which he argued demonstrated any error in dismissing Juror No. 1 was harmless given the rampant misconduct the jail calls revealed on Juror No. 1's behalf. This misconduct included Juror No. 1's romantic feelings for defendant during trial, her communications with defendant's brother during trial and his family after trial, and Juror No. 1 taking a photo of defendant during trial. Despite Juror No. 1's obvious bias, defendant argued that the acts of misconduct he cited in his motion were all substantiated by either Juror No. 2's declaration or the conversation the court had with Juror No. 7. Specifically, that a juror engineer tried to convince the jury that defendant was the shooter because of defendant's height based on his own calculations and that a methamphetamine-using juror commented his memory was better when he used drugs.
>
> The court denied defendant's motion for a new trial, finding Juror No. 1 was properly discharged, and that no juror or court misconduct occurred.

(ECF No. 13-2 at 3-10) (emphasis added).

The Court of Appeal denied petitioner's juror misconduct claim for the following reasons:

> *The Court Did Not Abuse Its Discretion By Denying Defendant's Motion For A New Trial*
>
> Defendant contends the trial court erred by denying his motion for a new trial because the jury committed misconduct by relying on facts not in evidence, i.e., the juror engineer's math equations and conclusions that defendant must be the shooter given his height and the methamphetamine-using juror's statements that a person under the influence of methamphetamine has a good memory. We disagree.
>
> A motion for a new trial may be granted on the ground of juror misconduct. (§ 1181, cases 2, 3, 4.) " ' "The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears." ' " (People v. Cox (1991) 53 Cal.3d 618, 694.) Once misconduct is shown, the misconduct "raises a presumption of prejudice '[which] the prosecution must rebut ... by demonstrating "there is no substantial likelihood that any juror was improperly influenced to the defendant's detriment." ' " (In re Boyette (2013) 56 Cal.4th 866, 892.) An appellate court reviews independently the determination of prejudice arising from juror misconduct, but the trial court's credibility determinations and factual findings are reviewed under the more deferential substantial evidence standard. (People v. Nesler (1997) 16 Cal.4th 561, 582 & fn. 5.)
>
> Defendant's contentions of juror misconduct raise the question of where to draw the line between permissible considerations of juror experiences and impermissible consideration of juror expertise. Our Supreme Court has held that "[i]t is not improper for a juror, regardless of his or her educational or employment background, to

express an opinion on a technical subject, so long as the opinion is based on the evidence at trial." (In re Malone (1996) 12 Cal.4th 935, 963.) A juror "should not discuss an opinion explicitly based on specialized information obtained from outside sources," as such an "injection of external information in the form of a juror's own claim to expertise or specialized knowledge of a matter at issue is misconduct." (Ibid.) Nevertheless, "if we allow jurors with specialized knowledge to sit on a jury, and we do, we must allow those jurors to use their experience in evaluating and interpreting that evidence." (People v. Steele (2002) 27 Cal.4th 1230, 1266.) "Moreover, during the give and take of deliberations, it is virtually impossible to divorce completely one's background from one's analysis of the evidence. We cannot demand that jurors, especially lay jurors not versed in the subtle distinctions that attorneys draw, never refer to their background during deliberations." (Ibid.)

As our Supreme Court has stated, "[a] fine line exists between using one's background in analyzing the evidence, which is appropriate, even inevitable, and injecting 'an opinion explicitly based on specialized information obtained from outside sources,' " which would be "misconduct." (People v. Steele, supra, 27 Cal.4th at p. 1266.) We find the cases defendant cites as particularly helpful for delineating where that line should be drawn and on what side this case falls.

In Stankewitz, the defendant was on trial for robbery based on an incident in which he demanded to see two individuals' wallets at gunpoint but returned the wallets without removing anything. (In re Stankewitz (1985) 40 Cal.3d 391, 396.) The jury was instructed on the elements of robbery, "including the requirement that the perpetrator have a specific intent to permanently deprive the victim of his property." (Id. at p. 399.) In a petition for habeas corpus, the defendant alleged juror misconduct based on declarations from two jurors stating a fellow juror had "advised the other jurors that he had been a police officer for over 20 years; that as a police officer he knew the law; that the law provides a robbery takes place as soon as a person forcibly takes personal property from another person, whether or not he intends to keep it ...." (Id. at p. 396.) Our Supreme Court held the juror had "committed overt misconduct" by " 'consult[ing]' his own outside experience as a police officer on a question of law.... Had he merely kept his erroneous advice to himself, his conduct might be the type of subjective reasoning that is immaterial for purposes of impeaching a verdict. But he did not keep his erroneous advice to himself; rather, vouching for its correctness on the strength of his long service as a police officer ...." (Id. at pp. 399-400.)

Conversely, in Lucas, the defendant claimed he killed his neighbors while he was unconscious after injecting himself with large quantities of methamphetamine, cocaine, and heroin. (In re Lucas (2004) 33 Cal.4th 682, 691.) A referee appointed to conduct an evidentiary hearing and make findings concerning the defendant's claim of juror misconduct determined that a juror had concluded the defendant had lied about how much drugs he had taken or the effect those drugs had on the defendant; the juror shared his opinion with

> the other jurors; and the juror's opinion was based on the juror's personal experience with controlled substances and not on evidence received at the trial. (Id. at pp. 693, 694-695.) Our Supreme Court rejected the claim of juror misconduct. (Id. at p. 697.) It noted that the juror did not hold himself out as an expert in a technical matter on the basis of his education or occupation, but merely related his personal experience about a matter that was of fairly common knowledge, as it related to the evidence and the inferences the defendant wanted the jury to draw from the evidence. (Ibid.) The Court also considered the fact that the juror disclosed that he was a former addict and alcoholic during voir dire. (Ibid.) Our Supreme Court further held it was not substantially likely that any juror was biased by the challenged juror's comments, considering the general awareness people had of the effects of controlled substances, the mild and brief nature of the comments, the tentative spirit in which they were offered, and the lack of insistence that the comments should convince the other jurors to reject the defense. (Ibid.)
>
> Here, the methamphetamine-using juror shared a personal experience relevant to the credibility of the witnesses at issue, much like the juror in Lucas. (In re Lucas, supra, 33 Cal.4th at p. 697.) Indeed, as Juror No. 1 provided in her declarations, several jurors shared their experiences related to memory and drug use, as did several witnesses. No juror relied on a purported expertise or education, and simply relayed personal experiences.
>
> On the other hand, the comments made by Juror No. 7 and the assertions contained in the declarations show the opinion given by the juror engineer fell on the impermissible side of the line. Like the juror in Stankewitz, the juror engineer relied on his expertise as an engineer to put forth the opinion that the bullet trajectory supported a conclusion that a tall person shot the victim. (In re Stankewitz, supra, 40 Cal.3d at pp. 399-400.) The juror engineer relied on math equations to prove to the rest of the jury his theory was correct. The problem with the juror engineer's opinion is that no evidence was introduced at trial pertaining to the bullet's trajectory. The prosecution did not seek conviction on this theory, nor did defendant pursue acquittal on a theory involving bullet trajectory. The juror engineer was not interpreting evidence when sharing his opinion with the rest of the jury, instead he was creating additional evidence for the jury to consider. This was improper.
>
> Even so, there was no substantial likelihood that any juror was improperly influenced to defendant's detriment. Juror No. 1 declared the jurors were all lost in the engineer juror's math. Moreover, Juror No. 1 also declared jurors changed their votes to guilty, not because of the juror engineer's purported expertise and opinion, but because they felt pressured by other jurors to do so. Thus, there is no causal connection between the juror engineer's statements and any juror's vote. Accordingly, the trial court did not err by denying defendant's motion for a new trial.

(ECF No. 13-2 at 13-17) (parallel citations omitted).

////

2. Legal Standards

The Sixth Amendment right to fair and impartial jury requires that jurors be "capable and willing to decide a case solely on the evidence before it." United States v. Olano, 507 U.S. 725, 738 (1993) (quoting Smith v. Phillips, 455 U.S. 209, 217 (1982)). "A defendant is entitled to a new trial when the jury obtains or uses evidence that has not been introduced during the trial if there is a reasonable possibility that the extrinsic material could have affected the verdict." Dickson v. Sullivan, 849 F.2d 403, 405 (9th Cir. 1988) (emphasis in original) (citation and internal quotation marks omitted). "However, on collateral review, trial errors—such as extraneous information that was considered by the jury—are generally subject to 'harmless error' analysis, namely, whether the error had 'substantial and injurious effect or influence in determining the jury's verdict." Smith v. Swarthout, 742 F.3d 885, 894 (9th Cir. 2014) (citation modified); see also Espinoza v. Montgomery, 816 Fed. Appx. 217 (9th Cir. Aug. 13, 2020) ("When considering prejudice due to juror misconduct, we must determine whether the error had substantial and injurious effect or influence in determining the jury's verdict.") (citation modified) (quoting Brecht v. Abrahamson, 507 U.S. 619, 623 (1993)).

"Juror misconduct cases in which habeas relief has been granted often involve the jury's receipt of information excluded from trial as unduly prejudicial such as evidence of the facts surrounding a defendant's prior conviction, bad reputation, or propensity to violate the law." Mancuso v. Olivarez, 292 F.3d 939, 953 (9th Cir. 2002), overruled on other grounds by Slack v. McDaniel, 529 U.S. 473 (2000). "The appropriate inquiry is whether there was a direct and rational connection between extrinsic material and the prejudicial jury conclusion, and whether the misconduct relates directly to a material aspect of the case." Id.

3. Discussion

Based on the circumstances of the jurors' challenged statements, it was not objectively unreasonable for the California Court of Appeal to conclude that these incidents did not improperly influence the jury to petitioner's detriment. Even if one of the juror's statements were improper, as the Court of Appeal found, petitioner has not shown prejudice from either one.

Turning first to the methamphetamine-using juror, his statements took place in the context

of engaging with four undecided jurors who, on the first day of deliberations, felt that prosecution witnesses Glass and Carter were not credible due to their history of frequent drug use. This led to multiple jurors discussing their past drug use and its effects on their memory. The juror at issue stated that, when he had used methamphetamine in the past, his memory had functioned better than normal. However, as set forth above, the four jurors continued to vote undecided and maintained that they couldn't trust the memories of people on methamphetamine.

The Court of Appeal characterized this juror's statements as a "personal experience relevant to the credibility of the witnesses at issue." The Ninth Circuit has distinguished "[t]he type of after-acquired information that potentially taints a jury . . . from the general knowledge, opinions, feelings, and bias that every juror carries into the jury room." Hard v. Burlington Northern R. Co., 870 F.2d 1454, 1461 (9th Cir. 1989). A juror bringing his personal experience to bear on the credibility of a witness is not a violation of the Sixth Amendment under Supreme Court precedent. See Grotemeyer v. Hickman, 393 F.3d 871, 879 (9th Cir. 2004) ("[A] juror's past experiences may be an appropriate part of the jury's deliberations.").

Moreover, the Court of Appeal found that the juror's statements did not affect the outcome of the trial. As petitioner points out, defense counsel conducted lengthy cross-examinations of the two prosecution witnesses, Glass and Carter, in an attempt to show that their methamphetamine use made them unreliable. (ECF No. 27-5 at 401-402 (Carter testimony that she had smoked methamphetamine daily for years and it had affected her memory), 583 (Glass testimony that he had used methamphetamine daily for years), 590-91 (Glass testimony that meth habit had caused brain damage and confusion)). As set forth above, the four jurors who were skeptical of Glass and Carter's testimony at the start of deliberations remained so, despite the juror's statements, but were pressured by other jurors to change their votes to guilty. Notably, the jury heard testimony that the victim identified petitioner as the shooter in a dying declaration. (ECF No. 37-1 at 167.) Petitioner has not shown that one juror's statements about his experience with methamphetamine had a substantial and injurious effect on the verdict. See Fields v. Brown, 503 F.3d 755, 781-82 (9th Cir. 2007) (no showing of prejudice where juror's introduction of Bible passages "occurred early on in deliberations. Jurors could take as much time as they needed

to sort through the evidence . . . [and] the jury was instructed to base its decision on the facts and law as stated by the judge").

As to the engineer juror, the Court of Appeal found that his opinions about the trajectory of the bullet and the shooter's height "fell on the impermissible side of the line, as no evidence was introduced at trial pertaining to the bullet's trajectory," and the engineer juror improperly created additional evidence for the jury to consider. This does not necessarily amount to constitutional misconduct on habeas review, however. See Grotemeyer, 393 F.3d at 879. At any rate, the Court of Appeal concluded that the engineer's statements were not prejudicial. There is no evidence that any juror changed his or her vote to guilty based on the engineer's calculations or speculation about the shooter's height. Petitioner has not shown a direct connection between the calculations of the engineer juror and the jury's ultimate vote to convict him of second degree murder.

Because the state court's decision was not contrary to, or an unreasonable application of, clearly established Supreme Court authority, nor based on an unreasonable determination of the facts, petitioner is not entitled to habeas relief on this claim.

**B. Claim Two: Judicial Bias**

Petitioner argues that the trial court was biased against him and toward the prosecutor, violating his right to due process and a fair trial. Respondent argues that petitioner has not shown constitutional error or prejudice.

On appeal, petitioner argued that "the trial court's participation in an extrajudicial school program with the prosecutor created, at the very least, the appearance of a conflict." (ECF No. 27-7 at 46.) At the time of petitioner's trial, the trial judge and prosecutor had participated together in two sessions of a legal education program called "First Impressions," where attorneys visited a fifth grade classroom for four days and then presided over the students' mock trial. (ECF No. 27-1 at 288, 293.) As petitioner's trial approached, the judge and prosecutor were scheduled to participate in the upcoming mock trial. (ECF No. 27-1 at 288.) In a hearing on petitioner's motion to disqualify, the trial judge stated that she had no contact with the prosecutor, socially or otherwise, outside the school program. (ECF No. 27-1 at 293, 295.)

Petitioner argued on appeal that the trial court's "potential . . . conflict was borne out" when she sustained nearly every one of the prosecutor's objections, showing "favoritism" toward the prosecution. (ECF No. 27-7 at 47.) Petitioner claimed that the trial court also "deferred to the prosecutor in preparing the jury questionnaire." (ECF No. 27-7 at 47-48.) Petitioner argues that the trial court's demonstrated bias was a constitutional error warranting habeas relief.

1. <u>State Court Opinion</u>

The California Court of Appeal issued the last reasoned state court decision addressing this claim. The California Court of Appeal summarized the facts underlying this claim as follows:

> *Facts Pertaining to Alleged Judicial Bias*
>
> Prior to trial, defendant moved to disqualify the judge presiding over the trial because he had learned the judge and prosecutor were currently involved in a student outreach program wherein they visited classrooms together with a defense attorney. They had completed three classroom visits and would complete one more before participating in a moot court together. Thereafter, defendant alleged the judge adopted the prosecutor's juror questionnaire with minor changes without considering defendant's questionnaire. Based on these facts, defendant argued the judge "demonstrated a bias in favor of [the prosecutor] and against defendant and/or defense counsel." (Capitalization and boldface omitted.)
>
> The judge answered defendant's motion, denying the allegations of judicial bias. The judge explained that the prosecutor "was a volunteer attorney for a program [she had] been involved with for many years. The program is called 'First Impressions'. It involves a Judge and a couple of attorneys teaching a fifth-grade class about the Constitution and criminal justice. It entails four visits to the classroom for about 45 minutes each session culminating in a mock trial at the courthouse in [the judge's] courtroom. The children learn about the [F]ifth and [S]ixth Amendments and then play the parts of attorneys and witnesses during the mock trial. [The judge had] participated in this program as an attorney and as a Judge for over 13 years. Th[at] year [wa]s the first time [the prosecutor] participated as a volunteer attorney. [The judge] did not ask him to participate. He had participated in two sessions and [wa]s *99 expected to help with the mock trial which usually lasts two hours. Judges and attorneys [are] encouraged to do community outreach. [The judge was] involved in this program as well as the Connie Callahan Inn of the Court and [she] attend[s] many county bar functions with numerous attorneys including those in the District Attorney's office and the Public Defender's office. As far as [the judge could] recall, the only contact [she had] ever had with [the prosecutor] outside of his appearing before [her wa]s the two school sessions of the program. [¶] [She] normally would not even feel this fact would merit disclosure except that the last school session and the mock trial were scheduled during this case so out of an abundance of caution [she]

> disclosed the information." Defendant's motion to disqualify the judge was denied.

(ECF No. 13-2 at 2-3) (parallel citations omitted).

The Court of Appeal denied petitioner's judicial bias claim for the following reasons:

> *The Trial Judge Did Not Violate Defendant's Due Process Right*
>
> Defendant contends the trial judge violated his right to due process under the Fourteenth Amendment to the United States Constitution because she favored the prosecutor, with whom she participated in a civics education program. We disagree, noting our decision addresses only the federal due process question raised by defendant.
>
> "According to the high court, the protection afforded a litigant under the due process clause in the realm of judicial disqualification extends beyond the narrow common law concern of a direct, personal, and substantial pecuniary interest in a case to 'a more general concept of interests that tempt adjudicators to disregard neutrality.' (Caperton [v. A. T. Massey Coal Co. (2009) 556 U.S. 868, 878.) Where such interests are present, a showing of actual bias is not required. 'The Court asks not whether the judge is actually, subjectively biased, but whether the average judge in his position is "likely" to be neutral, or whether there is an unconstitutional "potential for bias." ' (Id. at p. [881].) Moreover, the court has said that ' "what degree or kind of interest is sufficient to disqualify a judge from sitting 'cannot be defined with precision.' " ' (Id. at p. [879].) Nonetheless, the court has also made it abundantly clear that the due process clause should not be routinely invoked as a ground for judicial disqualification. Rather, it is the exceptional case presenting extreme facts where a due process violation will be found. (556 U. S. at [pp. 887-888].) Less extreme cases -- including those that involve the mere appearance, but not the probability, of bias -- should be resolved under more expansive disqualification statutes and codes of judicial conduct. (Ibid.)" (People v. Freeman (2010) 47 Cal.4th 993, 1005 (Freeman).)
>
> The extreme circumstances at issue in Caperton illustrate the heightened due process standard. There, the Supreme Court of Appeals of West Virginia reversed a trial court judgment entered following a jury verdict of $50 million. Five justices heard the case, and the vote to reverse was three to two. One of the justices in the majority denied a recusal motion. The basis for the motion was that the justice had received campaign contributions in an extraordinary amount ($3 million) from, and through the efforts of, the board chairman and principal officer of the corporation found liable for the damages. (Caperton v. A. T. Massey Coal Co., supra, 556 U.S. at pp. 872–873 (Caperton).)
>
> The Supreme Court explained that the case before it was " 'exceptional' " and concluded that " 'there is a serious risk of actual bias -- based on objective and reasonable perceptions -- when a person with a personal stake in a particular case had a significant and

disproportionate influence in placing the judge on the case by raising funds or directing the judge's election campaign when the case was pending or imminent.' (Caperton, supra, 556 U.S. at [p. 884].)" (Freeman, supra, 47 Cal.4th at p. 1004.) The Supreme Court focused on the relative size of the contribution -- it was larger than the amount spent by all other contributors and 300 percent greater than that spent by the campaign committee -- and the " 'temporal relationship between the campaign contributions, the justice's election, and the pendency of the case .... It was reasonably foreseeable, when the campaign contributions were made, that the pending case would be before the newly elected justice.' (Id. at pp. [885-886, 129 S. Ct. 2252].)" (Freeman, at p. 1004.)

Our Supreme Court has applied Caperton in a handful of cases, three of which offer helpful guidance in the present case. First, in Freeman, the defendant was tried before a judge who had previously disqualified himself based on an appearance of bias -- his friendship with a judge whom the defendant was rumored to have been stalking -- but who later was reassigned to the defendant's case after the stalking rumors proved unfounded. On appeal, the defendant argued that her trial before the previously disqualified judge violated her due process right to an impartial judge. Our Supreme Court rejected the claim, explaining that Code of Civil Procedure section 170.1, subdivision (a)(6)(A)(iii) provides "an explicit ground for judicial disqualification" based on "a public perception of partiality, that is, the appearance of bias." (Freeman, supra, 47 Cal.4th at pp. 996-999, 1001.) And, our Supreme Court noted, Caperton clarified that the due process clause operates more narrowly: "[W]hile a showing of actual bias is not required for judicial disqualification under the due process clause, neither is the mere appearance of bias sufficient. Instead, based on an objective assessment of the circumstances in the particular case, there must exist ' "the probability of actual bias on the part of the judge or decisionmaker [that] is too high to be constitutionally tolerable." ' ([Caperton, supra,] 556 U.S. at p. [877].)" (Freeman, at p. 996.)

Turning to the facts of Freeman, our Supreme Court concluded that the defendant's case did not implicate any of the concerns -- such as "pecuniary interest, enmeshment in contempt proceedings, or the amount and timing of campaign contributions" -- found in the United States Supreme Court's decisions holding that due process required judicial disqualification. (Freeman, supra, 47 Cal.4th at p. 1006.) Further, the circumstances were not so extreme as to warrant a finding of a probability of actual bias. "At most, [the judge's] decision to accept reassignment of defendant's case may have violated the judicial disqualification statutes that limit the actions that may be taken by a disqualified judge. [Citations.] But, without more, this does not constitute the kind of showing that would justify a finding that defendant's due process rights were violated." (Freeman, at p. 1006.)

Later that year, our Supreme Court decided People v. Cowan (2010) 50 Cal.4th 401, and elaborated on the showing required to establish judicial bias of constitutional dimension. "As the high court explained in Caperton, a constitutionally intolerable probability of

actual bias exists only when the circumstances ' "would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the State and the accused." ' [Citation.] This inquiry is an objective one, based on whether ' "under a realistic appraisal of psychological tendencies and human weakness," the interest "poses such a risk of actual bias and prejudgment that the practice must be forbidden ...." ' " (Cowen, at p. 457.)

Most recently, in Nieves, our high court considered whether multiple instances of judicial misconduct established judicial bias sufficient to violate the due process clause. There, the court determined that the trial judge engaged in judicial misconduct by making "inappropriately disparaging and sarcastic remarks to defense counsel, impugning his performance, chastising him for improper behavior, and sanctioning and citing him for contempt in front of the jury. The trial judge also directed improper comments and questions to witnesses, openly doubting the credibility of one defense expert by asking argumentative and hostile questions and remarking on the possibility that another defense expert 'just doesn't know what he's talking about.' When confronted with a juror who had been exposed to extrajudicial information that was likely to enhance the credibility of a prosecution expert, the trial court revealed the information to the entire jury. In the penalty phase, the trial judge needlessly reprimanded and belittled a lay witness who testified for the defense." (People v. Nieves (2021) 11 Cal.5th 404, 477.)

Notwithstanding the trial judge's misconduct, our Supreme Court rejected the defendant's argument that the misconduct violated his due process rights. Our Supreme Court summarized its prior cases in this area, noting that the " 'controlling principle' of unconstitutional bias rests on a 'general concept of interests' that may prevent adjudicators from remaining '"disinterested in the conviction or acquittal of those accused."' [Citations.] Though traditionally focused on pecuniary influences (Freeman, [supra, 47 Cal.4th] at pp. 1001-1002), the high court has explained that there may be a disqualifying interest in the outcome of criminal proceedings that 'rests on the relationship between the judge and the defendant.' (Caperton, [supra, 556 U.S.] at p. 881.) A judge would be unlikely to remain neutral, for example, when presiding over criminal contempt proceedings involving a defendant with whom the judge had a ' "running, bitter controversy." ' (Ibid.) Appellate opinions we cited in Freeman provide additional examples of bias that reflect a judge's relationship to the parties before it (Freeman, at p. 1006, fn. 4): in those cases, trial judges made inappropriate comments about women, in cases decided against women [citations], about lawyers, when the defendant was an attorney [citation], and about noncitizens, when one party was a foreign national [citation]." (People v. Nieves, supra, 11 Cal.5th at p. 499, 278 Cal.Rptr.3d 40.)

Applying the principles just summarized, we consider whether the trial judge's relationship with the prosecutor, which was based on a single instance of co-participation in a civics education program consisting of four classroom visits and a two-hour moot court

> session, reflects a constitutionally intolerable possibility that the judge harbored an interest in the outcome of defendant's trial. We conclude that it does not. The judge did not have a personal relationship with the prosecutor outside of court or the legal-related civics education program. Indeed, the judge did not socialize with the prosecutor on a different level than she socialized with other attorneys in the legal community, which was generally confined to bar events and other legal-based organizations. The fact that some of the judge's and prosecutor's interactions occurred during defendant's trial does not change this result. There was limited contact outside the courtroom and no evidence any of it was related to defendant's case; all evidence was to the contrary. Isolated opportunities to communicate about unrelated events, even if occurring during defendant's trial, do not in and of themselves demonstrate a constitutionally problematic interest. Defendant's claim of judicial bias of constitutional magnitude is without merit; he cannot point to an interest held by the trial judge that caused her to disregard judicial neutrality. (People v. Armstrong (2019) 6 Cal.5th 735, 798 ["a judge's 'rulings against a party -- even when erroneous -- do not establish a charge of judicial bias, especially when they are subject to review' "].)

(ECF No. 13-2 at 17-22) (parallel citations omitted).

2. Legal Standards

The Due Process Clause does not provide a uniform standard under which to analyze a judicial bias claim. Burney v. Broomfield, 175 F.4th 1089, 1103 (9th Cir. 2026) (citation omitted). "The Clause, however, does provide a 'constitutional floor' and requires a 'fair trial in a fair tribunal,' before a judge with no actual bias against the defendant or interest in the outcome of his particular case." Id. (citing Bracy v. Gramley, 520 U.S. 899, 904-05 (1997)) (citation modified). To succeed on a judicial bias claim, a petitioner must show that the facts demonstrate "an intolerable risk of bias." Id. (citation omitted); see Greenway v. Schriro, 653 F.3d 790, 806 (9th Cir. 2011) ("A showing of judicial bias requires facts sufficient to create actual impropriety or an appearance of impropriety."). "Without evidence of some extrajudicial source of bias or partiality, neither adverse rulings nor impatient remarks are generally sufficient to overcome the presumption of judicial integrity, even if those remarks are critical or disapproving of, or even hostile to, counsel, the parties, or their cases." Id. (quoting Larson v. Palmateer, 515 F.3d 1057, 1067 (9th Cir. 2008)) (citation modified). Judicial bias is a structural error that is not subject to harmless error analysis. Id. (citing Greenway, 653 F.3d at 805).

In Burney, the Ninth Circuit explained:

> The Supreme Court has found judicial bias where a judge had a personal or direct interest or involvement in the proceedings. For example, in Mayberry v. Pennsylvania, 400 U.S. 455 (1971), the trial judge, who was engaged in "a running, bitter controversy" with the defendant, id. at 465, also ruled over proceedings to determine whether the defendant was guilty of contempt, see id. at 465–66. In In re Murchison, 349 U.S. 133 (1955), the trial judge acted both as the trier of the defendant and the grand jury. See id. at 137. And in Tumey v. Ohio, 273 U.S. 510 (1927), the judge had a pecuniary interest in the cases he presided over because he stood to profit from each conviction. See id. at 523.

Id. at 1103-04 (parallel citations omitted). The Ninth Circuit determined that the petitioner in Burney had not shown judicial bias where the trial judge's comments "[did] not demonstrate that the judge had either a personal interest or direct involvement in the proceedings." Id. at 1104. Where the judge neither "relied upon knowledge acquired outside the proceedings" nor displayed "unequivocal antagonism" toward petitioner at trial, and where the judge's comments "[did] not show an intolerable risk of bias nor create an appearance of impropriety," petitioner did not show constitutional error. Id.

3. Discussion

Here as in Burney, petitioner has not shown judicial bias that rises to the level of constitutional error. Petitioner does not contend that the trial judge had a personal interest or direct involvement in his trial, nor that she relied on outside knowledge. His sole contention is that the judge's participation in an outside educational program, along with the prosecutor, created a risk of bias and/or the appearance of impropriety. Petitioner attributes certain rulings in the prosecution's favor to the trial judge's and prosecutor's co-participation in the school program and mock trial.

However, as the Court of Appeal reasoned, the mere fact that the government attorney and the judge both participate in a civic educational event does not show bias or impropriety. It is undisputed that the trial judge and prosecutor did not socialize or have a personal relationship outside the courtroom, except for the commonplace professional activity of mentoring a school mock trial program. The Court of Appeal's adjudication of petitioner's judicial bias claim accorded with recent Ninth Circuit law in Burney.

The state court's decision was not contrary to, or an unreasonable application of, clearly

established Supreme Court authority.

V. CONCLUSION

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." If petitioner files objections, he shall also address whether a certificate of appealability should issue and, if so, why, and as to which issues. A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(3). Any response to the objections shall be filed and served within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated: October 7, 2026

CHI SOO KIM
UNITED STATES MAGISTRATE JUDGE

6/clark1088.hc.f&rs